EFREM M. GRAIL (Bar. No. 124668)
(E-mail: egrail@graillaw.com)
Attorney for Defendant:
CALIN MATEIAS

The Grail Law Firm
Koppers Building, 30th Floor
436 Seventh Avenue
Pittsburgh, PA  15219
Telephone:        412/227-2969
Facsimile:        856/210-7354

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　　Plaintiff,<br><br>　　vs.<br><br>CALIN MATEIAS,<br><br>　　　　　Defendant. | Case No.: 2:11-cr-01174-ODW<br><br>**DEFENDANT CALIN MATEIAS'S SENTENCING MEMORANDUM IN SUPPORT OF A DOWNWARD VARIANCE**<br><br>DATE: May 7, 2018<br>TIME: 10:00 A.M.<br>Honorable Otis D. Wright, II |

DEFENDANT'S SENTENCING MEMORANDUM

# TABLE OF AUTHORITIES

## CASES

Gall v. United States, 552 U.S. 38 (2007) ........................................................ 13

Nelson v. United States, 555 U.S. 350 (2007) ................................................. 12

Pennsylvania ex rel. Sullivan v. Ashe, 302 U.S. 51 (1937) ............................. 12

Pepper v. United States, 562 U.S. 476 (2011) ................................................. 12

Rita v. United States, 551 U.S. 338, 351 (2007) ............................................. 12

United States v. Autery, 555 F.3d 864 (9th Cir. 2009) ..................................... 11

United States v. Booker, 543 U.S. 220 (2005) ................................................. 12

United States v. Cavera, 505 F. 3d 216 (2d. Cir. 2007) ................................... 19

United States v. Collins, 5:11-cr-00471 (N.D. Cal. July 13, 2011) ................. 17

United States v. Collins, 1:13-cr-383 (E.D. Va. Oct. 3, 2013) ........................ 18

United States v. Ruff, 535 F.3d 999 (9th Cir. 2008) ........................................ 13

## STATUTES, RULES & REGULATIONS

18 U.S.C. § 3553(a) ..................................................................................*passim*

U.S.S.G. § 5C1.1(d) ....................................................................................... 15

## ARTICLES

Cox, Joseph, "The History of DDoS Attacks as a Tool of Protest: In a New Book, Molly Sauter tracks the use of DDoS as an online equivalent to the real world sit-in." Oct. 1, 2014. (https://motherboard.vice.com/en_us/article/d734pm/history-of-the-ddos-attack, accessed Apr. 7, 2018) ..................................................................... 9

Kerr, Orin S. *Trespass, Not Fraud: The Need for New Sentencing Guidelines in CFAA Cases*, 84 Geo. Wash. L. Rev. 1544 (Dec. 2016).....................................................10

Lucas, Douglas,  "Exclusive: The Legendary #Anonymous Paypal 14 Speak Out Post-Sentencing." The Cryptosphere. Oct. 31, 2014. (https://thecryptosphere.com/2014/10/31/exclusive-the-anonymous-paypal-14-speak-out-post-sentencing/, accessed Apr. 18, 2018)......................................................17

Makrushin, Denis, "The cost of launching a DDoS attack." March 23, 2017. (https://securelist.com/the-cost-of-launching-a-ddos-attack/77784/, accessed Apr. 5, 2018).......................................................9

Paganini, Pierluigi,  "How much costs a DDoS attack service? Which factors influence the final price?"  March 26, 2017. (https://securityaffairs.co/wordpress/57429/cyber-crime/cost-ddos-attack-service.html, accessed Apr. 5, 2018).......................................................9

"Payback 13: Last of Anonymous anti-copyright hacktivists sentenced in Virginia." RT Feb. 20, 2015. (https://www.rt.com/usa/234191-anonymous-payback-collins-blake/, accessed Apr. 5, 2018).......................................................18

Viswanatha, Aruna, "'Anonymous' hackers plead guilty to minor charge in U.S. for cyberattacks." Reuters. Aug. 19, 2014. (https://www.reuters.com/article/us-anonymous-cybercrime-plea/anonymous-hackers-plead-guilty-to-minor-charge-in-u-s-for-cyberattacks-idUSKBN0GJ25720140819, accessed Apr. 17, 2018) ...........................................18

**BOOKS**

Sauter, Molly, The Coming Swarm, DDoS Actions, Hacktivism, and Civil Disobedience on the Internet. Bloomsbury, 2014 ...........................................................9

**OTHER MATERIALS**

Presentence Investigation Report, Mar. 28, 2018 (Dkt. 26) ...................................... *Passim*

"Understanding Denial-of-Service Attacks." United States Computer Emergency Readiness Team. February 6, 2013.  (https://www.us-cert.gov/ncas/tips/ST04-015, accessed May 26, 2016).......................................................5

# TABLE OF EXHIBITS:
## <u>LETTERS OF SUPPORT</u>

1. April 19, 2018 Letter of Kent Costley, Deputy Chief U.S. Probation Officer (ret).

2. October 30, 2017 Translation and Letter of Diaconescu Andrei, Defendant's future employer.

3. April 22, 2018 Translation and Letter of Popescu Anca Raluca, Defendant's Mother.

4. April 22, 2018 Translation and Letter of Margareta Oproiu, Defendant's close family member/friend.

(iii)

# **TABLE OF CONTENTS**

I.     INTRODUCTION ...................................................................................1

II.    STATEMENT OF FACTS ......................................................................4

   A. Background & Offense Conduct...................................................4

   B. Guilty Plea & Plea Agreement ....................................................7

III.   DISCUSSION..........................................................................................8

   A. The Enhancement for "Sophisticated Means" Does Not Apply In
      This Case ........................................................................................8

   B.  The Statutory Sentencing Factors in 18 U.S.C. § 3553(a) Require
      a Sentence Below the Guidelines Range .....................................11

        1. 18 U.S.C. § 3553(a)(1): The nature and circumstances of the offense
           and the history and characteristics of the defendant..........................13

             (a) The nature and circumstances of the offense .........................13

             (b) The history and characteristics of the defendant....................14

        2. 18 U.S.C. § 3553(a)(2): The need for the sentence imposed (A) to
           reflect the seriousness of the offense, to promote respect for the law,
           and to provide just punishment for the offense; (B) to afford
           adequate deterrence to criminal conduct; (C) to protect the public
           from further crimes of the defendant; and (D) to provide the
           defendant with needed educational or vocational training, medical
           care, or other correctional treatment in the most effective manner  14

       3 & 4. 18 U.S.C. § 3553(a) (3) and (4): the kinds of sentences available,
           and the kinds of sentence and the sentencing range established for
           the offense of conviction .....................................................15

        5. 18 U.S.C. § 3553(a)(6): The need to avoid unwarranted sentencing
           disparities among defendants with similar records who have been
           found guilty of similar conduct ..........................................15

C. **A Downward Variance Under Booker In This Case Is Justified And Fitting** ............................................................................... 20

IV.   **CONCLUSION** ............................................................................. 20

## DEFENDANT CALIN MATEIAS'S SENTENCING MEMORANDUM IN SUPPORT OF A DOWNWARD VARIANCE

Federal courts often do not sentence computer hackers, including ones responsible for causing vastly greater losses than in this case, to jail. Numerous individuals found guilty of similar conduct, causing losses *200 to 300 times greater* than the $30,000 at issue in this case, received a probation sentence: *they served no jail time*. The defendant here has already been in jail for half a year. To avoid overwhelming sentencing disparity, this Court should order his immediate release, so that he may leave the United States and return to his native Romania now. Almost six (6) months of prison in a foreign country where he has no visitors and no family is sufficient time to have served for a video game.[1]

## I.     INTRODUCTION

At issue in this case is the decade-old conduct of Calin Mateias. At the time, he was an unemployed young man living at home with his mother in Bucharest. The Romania of ten years ago had little functional economy, offered few jobs and promised fewer opportunities. Without work, Calin occasionally made ends meet by doing

---

[1] If this Court will not grant Mr. Mateias's immediate release, it should, alternatively, impose a sentence of no more than the ten months recommended by the Government, with every remaining day beginning now served in community confinement, performing public service in the local Romanian community under the supervision of an orthodox priest who has agreed to oversee the defendant's release.

---

freelance web design and computer systems configuration with skills he had taught himself, for a little money or in barter with others.  To pass the time, he played video games, including a multi-player online one called World of Warcraft ("WoW"), which was created, owned, and operated by Blizzard Entertainment, an Irvine, California-based video game company.  Angered by a player he regularly competed against, the defendant determined to defeat his WoW opponents by interrupting the game's server so they could not access the game.  His actions were motivated by a juvenile desire to win the game, and for others to lose it.  At the time, Calin was not focused on the impact his actions would have on the game servers, its owner/operator, and other players.  His actions of a decade ago were wrong, and he has since come to understand, regret and take responsibility for the harm he caused.

Mr. Mateias has admitted his guilt in full.  He never had a grand plan to shut down some of the European online game, he simply did not consider the consequences of his actions at the time.  He was not motivated by greed or profit.  He has recognized the relative seriousness of this offense.  Most importantly, Calin has already spent significantly more time in jail on this matter than most other individuals sentenced for theft or vandalism of far greater loss have received.  This Court should vary downward from the Government's recommended Guidelines sentence range of imprisonment and allow Calin to return home immediately, as he has agreed in the Plea to do.  He has been

adequately punished; to keep him in custody would result in a vastly disproportionate sentence compared to others who have committed similar offenses, at great expense to the Government.

Calin is a changed, mature man far removed from that turbulent time in his life. He is eager to return home to a country whose economy has begun to provide opportunity. He has a steady job waiting for him there, where he can devote his energies to building a life and caring for his ill mother. His crime was non-violent and caused minimal damage to a massive videogame company that has continued to grow and thrive.[2] A prompt release would also result in far-reduced government costs of incarceration best reserved for more serious offenders. Considering the facts and circumstances of this particular case and this particular defendant, a "time served" sentence with ordered immediate release for his agreed-upon voluntary removal from the country would best serve the interests of justice, in that it would be sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a).

---

[2] In 2010, at the time of Defendant's offense conduct, Blizzard Entertainment's net revenue was $1.65 billion. In 2017, Blizzard Entertainment's net revenue was $2.13 billion.

DEFENDANT'S SENTENCING MEMORANDUM 3

## II.   STATEMENT OF THE FACTS

### A. Background & Offense Conduct

Mr. Mateias was born on November 11, 1979 in Bucharest, Romania.  An only child, he never knew his father.  He lived with and cared for his mother, Popescu Anca Raluca, now seventy (70) years old.  She raised him alone in a three-room apartment during the last years of an oppressive Communist regime, where he endured a difficult childhood:

> There were food shortages throughout the 1980s and Mateias recalls standing in line with his mother as a little boy in freezing temperatures for bread and butter. Mateias also has memories of the citizenry's collective paranoia, being careful what one said and to whom; fearful of being reported to authorities.[3]

Calin excelled in school, where he learned English, but his main interest lay in computers.  He spent twelve (12) hours a day in front of a laughably out-of-date desktop, and left school after the 11th grade to spend more time on it.  Later, he turned his pastime into a career (of sorts,) performing web design and systems configuration work; but like most young persons in Romania, was never able to secure full-time employment nor earn much money.  Although the dictatorship had fallen in 1989, daily Romanian life did not improve much right away, and as of the date of this offense, the economy had not prospered.

---

[3] Presentence Investigation Report ("PSR")(Dkt. 26), par. 46.

Sometime in 2008, Mr. Mateias began playing WoW, the popular multi-player online "role-playing" game.  Players participate in the game by using "avatars."  The game features elements of magic and science fiction and enables players to interact and battle each other and other computer-generated characters that are part of the online, "virtual" world.  Gamers form teams and play together to complete specific tasks to advance, such as by defeating made-up mythical beasts in a dungeon.  As a reward for completing these tasks,  players win shares of "loot" divided up between successful members of the raiding team.  "Loot" is used to purchase virtual equipment (i.e., in the game only) for the avatar's use.

Over time, Mr. Mateias got into disputes with other WoW players over who was on which team and who got the loot.  As a result, in order to win the game and so others would lose it, Calin launched "Distributed Denial of Service ("DDoS") actions in 2010 against the European computer servers owned by Blizzard Entertainment.  A DDoS action is a simple and inexpensive computer attack against other computers on the Internet which makes a computer server(s) unavailable by disrupting its internet feed.[4] In effect, the action overwhelms the computer server with requests for information from many different sources until it stops working properly.[5]  These DDoS actions impaired

---

[4] "Understanding Denial-of-Service Attacks," United States Computer Emergency Readiness Team. February 6, 2013.  (https://www.us-cert.gov/ncas/tips/ST04-015, (accessed May 26, 2016).
[5] Id.

DEFENDANT'S SENTENCING MEMORANDUM 5

some of the European WoW servers used by other players and prevented them from accessing the game, or greatly limited their ability to play it.  Blizzard spent $29,987 in response, some of it to repair the servers, but most of it dedicated to tracking down Calin.

Mr. Mateias was paroled into this country for prosecution upon his seizure on a U.S. extradition warrant in early November, 2017.  Prior to his arrest, Mr. Mateias spent three (3) years and eight (8) months in Romanian prison for unrelated conduct.  That country's conviction was based on conduct that occurred in the late 1990s and early 2000s.[6]  Mr. Mateias's original sentence in that matter was six (6) years; he was released after almost four (4) years because of both the dismal, inhumane conditions of Romanian prisons, and because of his exemplary conduct in jail.  He was a model prisoner who earned numerous certificates for good behavior, regularly working at the local court archives organizing files, volunteering to assist the local court in reorganization projects, and studying personal development skills. He habitually attended Sunday morning worship services and was visited weekly by his mother. He has a written offer of employment upon his return home and wants nothing more than to return there and begin

---

[6] In 2003, the United States Attorney's Office for the Western District of Pennsylvania charged Mr. Mateias for the same crimes resulting in the same losses by the same victim through the same circumstances and occurrences for which Mr. Mateias was convicted in Romania (United States v. Mateias Calin, aka Calin Mateias, 2:03-cr-00281 (W.D. Pa. 2003).  Another indictment in this District for the same conduct was later dismissed, in deference to the W.D. Pa. action.  See United States v. Mateias, 2:04-cr-01042, Dkt. No. 279 (Oct. 3, 2016).

DEFENDANT'S SENTENCING MEMORANDUM 6

working.[7]  His experience in prison had a marked impact on him; indeed, Calin is a different person than the immature, unemployed game player he was at the time of this offense.

B. **Guilty Plea & Plea Agreement**

On February 5, 2018, Mr. Mateias formally entered his guilty plea before this Court to the single count indictment of violating 18 U.S.C. § 1030(a)(5)(A) of the Computer Fraud & Abuse Act ("the CFAA"), Intentional Damage to a Protected Computer.[8]  The Government's Plea Agreement set out all the applicable Sentencing Guidelines factors:

| | |
|---|---|
| Base Offense Level: U.S.S.G. § 2B1.1(a)(2) | +6 |
| Specific Offense Characteristics: Loss Amount (U.S.S.G. § 2B1.1(b)(1)(C)) (between $15,001 & $40,000) | +4 |
| Special Offense Characteristics: Violation of 18 U.S.C. §1030(a)(5)(A) (U.S.S.G. § 2B1.1(b)(18)(A)(ii)) | +4 |
| Subtotal | 14 |
| Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| Total Offense Level | 12 |

---

[7] October 30, 2017 Translation and Letter of Diaconescu Andrei, Defendant's future employer.
[8] Dkt. 23.

Based on the Plea Agreement's total offense level of 12 and Mr. Mateias's criminal history category of I[9], the guideline imprisonment range is 10 to 16 months.[10]

Importantly, the U.S. Attorney in the Plea Agreement pledged to:

> Recommend that [Mr. Mateias] be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range, provided that the offense level used by the Court to determine that range is 12 or higher.[11]

The low end of the Plea Agreement Guidelines range is 10 months.[12]

On the date of sentencing, Mr. Mateias will have been in custody for a full six months.[13]

## III.   DISCUSSION

### A. The Enhancement for "Sophisticated Means" Does Not Apply In This Case

In its Preliminary Pre-Sentence Investigation Report, the Probation Department called for a two (2) level enhancement for "sophisticated means," at Par. 21, under USSG § 2B1.1(b)(10)(C).  The enhancement is not justified and it should not be applied, as the defendant argued in his Objections to Pre-Sentence Investigation Report and Probation Officer's Letter of Recommendation, at Dkt. No. 27.

---

[9] PSR, at 3.
[10] U.S.S.G. § Ch. 5, Part A.
[11] Dkt. 22, par. 3(d).
[12] The Plea Agreement also stipulates that at or shortly thereafter the time of sentencing, the U.S. Attorney for the Western District of Pennsylvania will also move to dismiss the indictment in its pending matter United States v. Mateias Calin, aka Calin Mateias, 2:03-cr-00281 (W.D. Pa.).
[13] Mr. Mateias was "arrested" upon his release from the prison in Bucharest on November 7, 2017, by U.S. Marshals and paroled into this country on November 20, 2017.  He has been held in the Los Angeles Metropolitan Detention Center ever since.

---

DEFENDANT'S SENTENCING MEMORANDUM 8

According to the Probation Department, the "sophisticated means" here consisted of Mr. Mateias using his "specialized knowledge" to "coordinate a collection of computers to transmit a flood of superfluous requests to [Blizzard Entertainment's] servers" in a DDoS action.[14]  But, the basis for a "sophisticated means" enhancement is absent here, because the offense conduct was not complex.  Instructions for DDoS actions are easy to find or write.  The actions are cheap to run and simple to execute. Indeed, a DDoS action is a considered a "technologically crude tactic"[15]  and is "incredibly simplistic, at a purely technological level."[16]  Advanced technical skills are not required to construct a simple automated DDoS tool.[17]  Instructions for carrying out a DDoS action are also readily available on the internet with minimal searching.[18]  They

---

[14] PSR, pars. 21-22.

[15] Cox, Joseph, "The History of DDoS Attacks as a Tool of Protest: In a New Book, Molly Sauter tracks the use of DDoS as an online equivalent to the real world sit-in." Oct. 1, 2014. (https://motherboard.vice.com/en_us/article/d734pm/history-of-the-ddos-attack, accessed Apr. 7, 2018).

[16] Id.

[17] Sauter, Molly, The Coming Swarm, DDoS Actions, Hacktivism, and Civil Disobedience on the Internet. Bloomsbury, 2014, at 15.

[18] Paganini, Pierluigi,  "How much costs a DDoS attack service? Which factors influence the final price?"  March 26, 2017. (https://securityaffairs.co/wordpress/57429/cyber-crime/cost-ddos-attack-service.html, accessed Apr. 5, 2018).

---

are relatively cheap and easy to organize[19], costing as little as $7 an hour.[20]   The instructions are not sophisticated to execute.[21]

The U.S. Attorney's Office has not sought to characterize the offense or conduct as complicated.  In the past, prosecutors have routinely sought to portray CFAA prosecutions as complex measures requiring extensive computer knowledge and experience to execute, thus by their very nature involving the use of "sophisticated means."[22]  Now it is the Probation Office, writing in the PSR, which has attempted this misleading portrayal.  Its reference to the enhancement, further, seeks to wrongly appeal to negative cultural stereotypes and media depictions of "hackers."[23]  The PSR's reliance on "specialized knowledge" as the basis for the enhancement is without merit.

In effect, the Probation Department is substituting its own judgment – without support – for that of the U.S. Attorney's Office, despite the federal prosecutor's superior grasp of the facts and circumstances which make up the underlying offense conduct. Indeed, the Assistant U.S. Attorney who charged this case worked directly with the law

---

[19] Makrushin, Denis, "The cost of launching a DDoS attack." March 23, 2017. (https://securelist.com/the-cost-of-launching-a-ddos-attack/77784/, accessed Apr. 5, 2018).

[20] See Paganini, supra, n. 18.

[21] Sauter, supra, n. 17, at 15.

[22] Kerr, Orin S., *Trespass, Not Fraud: The Need for New Sentencing Guidelines in CFAA Cases*, 84 Geo. Wash. L. Rev. 1544, 1562 (Dec. 2016) ("It appears that, at least to some courts, figuring out how to commit a CFAA violation is inherently sophisticated").

[23] See Sauter, *supra*, n. 16, at 145.  ("[S]ophisticated means" sentencing enhancements exacerbate the lack of technical knowledge among members of the judiciary and can easily result in substantially more severe sentences for [CFAA] defendants").

---

DEFENDANT'S SENTENCING MEMORANDUM 10

enforcement agencies that investigated, documented and developed the underlying facts. It speaks volumes that this prosecutor did not seek a "sophisticated means" enhancement.[24]  In light of the simplicity of the offense conduct and consistent with the responsible prosecutor's position on sentencing in this case, this Court should not apply the "sophisticated means" enhancement.

### B.  The Statutory Sentencing Factors in 18 U.S.C. § 3553(a) Require a Sentence Below the Guidelines Range

The Sentencing Guidelines are not mandatory. It *is always* within the discretion of the Court to avoid injustice which would result from their rigid application.  Indeed, it is a reversible error for a court to treat the guidelines as mandatory and fail to acknowledge any mitigating factors:

> It would be procedural error for a district court to fail to calculate — or to calculate incorrectly — the Guidelines range; to treat the Guidelines as mandatory instead of advisory; to fail to consider the § 3553(a) factors; to choose a sentence based on clearly erroneous facts; or to fail adequately to explain the sentence selected, including any deviation from the Guidelines range.

United States v. Autery, 555 F.3d 864, 869-870 (9th Cir. 2009).  But all too often, courts are tempted to rely on mechanical application of the Guidelines and/or Justice Department recommendations.

---

[24] The Probation Department's insistence on the enhancement for sophisticated means is nearly superfluous given the realistic impact of the Government's and the Probation Department's recommendations in this matter.  The difference in sentence between the U.S. Attorney's recommended ten month sentence and that recommended by the PSR of 12 months and 1 day, in light of credit for time served and the benefit of the reduction under statue for "good time," is eighteen (18) days.

DEFENDANT'S SENTENCING MEMORANDUM 11

For the determination of sentences, justice requires consideration of more than the particular criminal acts, in favor of taking into account the circumstances of the offense together with the character and propensities of the offender. <u>Pepper v. United States</u>, 562 U.S. 476, 488 (2011) (quoting <u>Pennsylvania ex rel. Sullivan v. Ashe</u>, 302 U.S. 51, 55 (1937)). As the Supreme Court has directed in <u>United States v. Booker</u>, 543 U.S. 220 (2005), and its progeny, district courts must look to the advisory Sentencing Guidelines as merely *the starting place* among a number of factors to consider in the sentencing calculus. <u>Rita v. United States</u>, 551 U.S. 338, 351 (2007) ("…the sentencing court does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply."); see also, <u>Nelson v. United States</u>, 552 U.S. 85, 113 (2007) ("Our cases do not allow a sentencing court to presume that a sentence within the applicable Guidelines range is reasonable").

Sentencing determinations may not be driven or controlled by rigid adherence to the numerical technicalities of the Sentencing Guidelines. Indeed, consideration of the § 3553(a) factors in contemplation of a sentencing variance is a separate and distinct exercise which cannot be conflated into the sentencing guideline and departure determination.  Further, the Court's determination that a variance is appropriate shall not be disturbed on appeal, where the Court articulates its clear reasoning on the record:

DEFENDANT'S SENTENCING MEMORANDUM 12

> Even if we are certain that we would have imposed a different sentence had we worn the district judge's robe, we can't reverse on that basis. Following the Supreme Court's clear mandate, we defer to the district court's "reasoned and reasonable decision that the § 3553(a) factors, on the whole, justified the sentence." [Internal citations, quotations omitted.]

United States v. Ruff, 535 F.3d 999, 1004 (9th Cir. 2008) (affirming below-guideline sentence post-Gall[25] based on district court's reasoning in business crimes case).

### 1.  18 U.S.C. § 3553(a)(1): The nature and circumstances of the offense and the history and characteristics of the defendant.

#### (a) The nature and circumstances of the offense

The nature and circumstances of the offense warrant the Defendant's immediate release for his voluntary removal from the country.  As noted here, he has taken full responsibility for his actions and their impact on the Blizzard servers.  He understands that his actions affected others.  The Court should consider that the conduct at issue occurred almost a decade ago, was wholly nonviolent in nature, involved only economic damages, resulted in a relatively minor amount of loss, and arose from Mr. Mateias's desire to win an *online video game*.  Calin's actions were not motivated by greed or profit and they were not part of some larger scheme to cause wide-scale systemic or permanent technological damage.  He merely wanted to win, again, an *online video game*.

---

[25] Gall v. United States, 552 U.S. 38 (2007).

### (b) The history and characteristics of the defendant

Calin's personal history and life story support his immediate release. He has endured a difficult life: born into poverty, never knowing his father, living with scarcity of food and other basic necessities. He grew up under the rule of a Communist dictator in an economically depressed country with few job opportunities and was never able to secure full-time employment.

Calin has matured since 2010. He has grown into a responsible, devout Romanian Orthodox committed to bettering himself. He has taken advantage of the opportunities available to him and is able, willing and ready to make a positive contribution in his homeland, and move beyond his criminal conduct and prison term. He has a job waiting for him in Bucharest. He wants only to return home to begin working, to take care of his ailing mother, and to restart his life.

**2. 18 U.S.C. § 3553(a)(2): The need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

Mr. Mateias has already recognized the seriousness of his offense, and the need to promote respect for the law by serving a just punishment which adequately deters such conduct. His six (6) months behind bars is excessive punishment for the conduct at issue.

---

DEFENDANT'S SENTENCING MEMORANDUM 14

He was extradited from his home country, his family and his support network.  He has suffered since being placed in American custody.  His risk of recidivism is low, given that he will be returning to a stable home and work environment outside of this country.

**3 & 4.     18 U.S.C. § 3553(a) (3) and (4): the kinds of sentences available, and the kinds of sentence and the sentencing range established for the offense of conviction.**

The Government has agreed to recommend that Mr. Mateias be sentenced to a term of imprisonment no higher than the low end of the applicable Sentencing Guidelines range.[26]  The Plea Agreement Guidelines range, based on a total offense level of 12 and a criminal history category of I,[27] is therefore 10 to 16 months.[28]  Under the Plea Agreement (and even under the Probation Office's recommendation), the sentence falls into Zone C of the Sentencing Table; Mr. Mateias is thus eligible to serve one-half (1/2) of his sentence in community confinement, under U.S.S.G. § 5C1.1(d).[29]

---

[26] Dkt. 22, par. 3(d).

[27] The PSR guideline imprisonment range, based on a total offense level of 13 and a criminal history category of I, is 12 to 18 months.

[28] Dkt. 22, par. 13.

[29] (d)     If the applicable guideline range is in Zone C of the Sentencing Table, the minimum term may be satisfied by –

      (1)     a sentence of imprisonment; or

      (2)     a sentence of imprisonment that includes a term of supervised release with a condition that substitutes community confinement or home detention according to the schedule in subsection (e), provided that at least one-half of the minimum term is satisfied by imprisonment.

---

DEFENDANT'S SENTENCING MEMORANDUM 15

Should this Court not allow a "time-served" sentence – as it should – then community confinement with the condition of service is warranted.  Mr. Mateias could provide a great benefit if allowed to do so.  Father Constantin Alecse, the pastor at Holy Trinity Romanian Orthodox Church in Los Angeles and a leader in the local Romanian-American community, is a prominent minister who has previously worked to find former prisoners suitable and meaningful community service activities.[30]  Father Alecse has agreed to do the same for Calin.[31]  This structured and regimented community service work for the Romanian and Romanian-speaking community under the supervision of Father Alecse should weigh against any concerns the Court may have about allowing Mr. Mateias, a paroled alien, to serve out the last part of his sentence in community confinement, were this court to release Calin for voluntary removal on a  "time served" sentence, which is just punishment in this matter now.

Since the Booker decision, this Court is compelled to consider a Guideline sentence as just the start of its sentencing analysis.  The Court is not only free, but in fact compelled (i.e., "The Court shall… [emphasis added]") to consider alternatives to guideline incarceration where an alternative is sufficient, but not greater than necessary to achieve the overall goals of sentencing. In this case, such an alternative "split" sentence

---

[30] See April 19, 2018 Letter of Kent Costley, Deputy Chief U.S. Probation Officer (ret).
[31] Id.

---

DEFENDANT'S SENTENCING MEMORANDUM 16

with community service in the Romanian-speaking community would come closer to serving the interests of justice than leaving Mr. Mateias in lock-down custody.

> **5.** **18 U.S.C. § 3553(a)(6): The need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct.**

This statutory factor is particularly important here, as Mr. Mateias's time in custody *already* constitutes an outlier sentence. His conduct was limited and caused minimal damage. Other hackers who have engaged in similar conduct that caused far greater harm, but have received far lesser – indeed, almost none at all – punishments than both the Prosecution's ten-month (10) Guideline Sentence, and even the six (6) months Calin has already spent in custody.

In December 2010, in response to PayPal, Visa, MasterCard and Amazon deciding to cease processing WikiLeaks' contributors' online donations, a group of hackers launched crippling DDoS actions (as in this case) against these payment processors. The attacks against PayPal, the world's largest online payment processor, lasted 4 days, and caused repeated site outages during the holiday gift buying system, resulting in $5.6 million in damages.[32] Fourteen (14) of the hackers were indicted in the Northern District of California for violating the statute at issue in this case ("the PayPal 14").[33] Eleven (11)

---

[32] Lucas, Douglas, "Exclusive: The Legendary #Anonymous Paypal 14 Speak Out Post-Sentencing." The Cryptosphere. Oct. 31, 2014. https://thecryptosphere.com/2014/10/31/exclusive-the-anonymous-paypal-14-speak-out-post-sentencing/, accessed Apr. 18, 2018.
[33] U.S. v. Collins, 5:11-cr-00471 (N.D. Cal. July 13, 2011).

of them pled guilty to one (1) felony CFAA count (as in this case), were placed *on supervised release* for one year, and were allowed to withdraw their felony plea after one (1) year and enter a *misdemeanor plea*.[34]  Two (2) of them *plead guilty to misdemeanors and received three (3) and four (4) month community confinement sentences*.[35]  The remaining PayPal 14 member eventually had his *charges dropped*.[36]  Not one of these defendants served any prison time for a DDoS attack that cost the world's largest online payment processor over $5 million dollars.

A few years later, the Justice Department again filed CFAA charges against thirteen (13) hackers ("the Payback 13") in the Eastern District of Virginia, again in connection with DDoS attacks.[37]  The damages in that case reportedly reached $8.9 million.[38]  All of these defendants were later permitted to plead to misdemeanors,[39] in essence the same plea as the PayPal 14, in part because the judge expressed dismay at the Government's attempts to seek harsher punishment for the Payback 13 in light of the similarities in their underlying criminal conduct to that of the PayPal 14.[40]  The most jail

---

[34] Id.
[35] Id.
[36] Id.
[37] U.S. v. Collins, 1:13-cr-383 (E.D. Va. Oct. 3, 2013).
[38] "Payback 13: Last of Anonymous anti-copyright hacktivists sentenced in Virginia." RT Feb. 20, 2015. (https://www.rt.com/usa/234191-anonymous-payback-collins-blake/, accessed Apr. 5, 2018).
[39] U.S. v. Collins, 1:13-cr-383 (E.D. Va. Oct. 3, 2013).
[40] Viswanatha, Aruna, "'Anonymous' hackers plead guilty to minor charge in U.S. for cyberattacks." Reuters. Aug. 19, 2014.

time the court gave any defendant in that case was thirty (30) days of intermittent confinement.[41]

Notwithstanding the immensity of the disruption and financial losses the PayPal 14 and the Payback 13 ("the Hackers") caused, none of them ended up with felony records and none of them were sentenced to prison. Calin, while causing a mere fraction of the loss and disruption than in those former cases, plead guilty to a felony and has already served a longer prison sentence than any of these other 27 defendants, and more than almost all of their sentences *combined*. To not immediately release him would result in an unwarranted sentencing disparity between Mr. Mateias and the PayPal and Payback defendants, despite their similar conduct and the much, much smaller loss for which he is responsible.[42] Keeping Calin in custody one (1) day longer would directly contravene the interests of justice and purposes underlying the Sentencing Guidelines.

---

(https://www.reuters.com/article/us-anonymous-cybercrime-plea/anonymous-hackers-plead-guilty-to-minor-charge-in-u-s-for-cyberattacks-idUSKBN0GJ25720140819, accessed Apr. 17, 2018)("Similar cases brought by the U.S. Attorney's office in San Jose were largely resolved through misdemeanor convictions with no jail time, and the federal judge overseeing the Virginia set of cases had asked why similar defendants were facing more severe punishment in his state. 'You've still got a disparity issue, and it's a serious one,' U.S. District Judge Liam O'Grady told federal prosecutors on the case at a May hearing, according to a transcript of the proceedings. … '[F]rom what I have seen right now, California got it right. And you ought to be thinking about it.'")

[41] See U.S. v. Collins, supra, at n. 39.

[42] The Guidelines aim to eliminate disparities in sentences meted out by different district courts to defendants who commit similar offenses. United States v. Cavera, 505 F. 3d 216, 221 (2d. Cir. 2007). See, e.g., USSG § Ch. 1, Pt. A. (When Congress enacted the Sentencing Reform Act of 1984, it "sought reasonably uniformity in sentencing by

---

## C.  A Downward Variance Under Booker In This Case Is Justified And Fitting

Mr. Mateias respectfully requests that this Court vary downward from the guideline sentence, and instead impose a sentence of time served and order his immediate release so that he may leave the country by way of voluntary removal without delay pursuant to the Plea Agreement.  Such a sentence constitutes adequate punishment, eliminates further sentencing disparity, deters Calin and others through its deterrent impact from engaging in similar conduct in the future, reduces incarceration costs and enables him to reunite with his aging mother to become a working citizen in the new Romanian society.  The life Mr. Mateias will be returning to is vastly different, for the better, from the unsettled atmosphere of ten years ago, when, without a job, opportunities or hope, he was left at home to simply rage against the computer system for the games he played and against the people he played.

## IV.  CONCLUSION

All of the above should factor in favor of a downward variance by this Court, and compel its decision to immediately release the Defendant so that he may leave the United States for home.  For the foregoing reasons, Mr. Mateias humbly and respectfully requests that the Court impose a sentence of time served.  In the alternative, this Court should impose a "split sentence" of ten months with the remainder of sentence to be

---

narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders.")

served in community confinement with the condition of community service, to begin promptly.  The advisory Sentencing Guidelines, 18 U.S.C. § 3553(a), and the policies they both seek to promote provides for this Court to hand down either sentence.  Given all of the circumstances of this case, release now is the only truly fair option for this Court to serve the interests of justice.

DATED: April 23, 2018

Respectfully submitted,

/s/ Efrem M. Grail

EFREM M. GRAIL
The Grail Law Firm
(E-mail: egrail@graillaw.com)
Koppers Building, 30th Floor
436 Seventh Avenue
Pittsburgh, PA  15219
Telephone:      412/227-2969
Facsimile:      856/210-7354

Attorney for Defendant:
CALIN MATEIAS

DEFENDANT'S SENTENCING MEMORANDUM 21

## **CERTIFICATE OF SERVICE**

I, EFREM M. GRAIL, ESQUIRE, hereby certify that a true and correct copy of the foregoing **DEFENDANT CALIN MATEIAS'S SENTENCING MEMORANDUM IN SUPPORT OF A DOWNWARD VARIANCE** was filed on April 23, 2018, with the Clerk of Court using the CM/ECF system and thereby becoming immediately available to the following:

Khaldoun Shobaki, Esquire
Assistant United States Attorney
United States Attorney's Office
312 North Spring Street, Suite 1200
Los Angeles, California 90012
Phone: (213) 894-0759
Fax: (213) 894-2927
khaldoun.shobaki@usdoj.gov

with a courtesy copy provided to the Probation Department by electronic mail, and hard copy hand-delivered to Chambers pursuant to Local Rules.

Respectfully submitted,

/s/ Efrem M. Grail

EFREM M. GRAIL
The Grail Law Firm
(E-mail: egrail@graillaw.com)
Koppers Building, 30th Floor
436 Seventh Avenue
Pittsburgh, PA  15219
Telephone:     412/227-2969
Facsimile:      856/210-7354

Attorney for Defendant:
CALIN MATEIAS

---

DEFENDANT'S SENTENCING MEMORANDUM